IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FREDERICK RAVNELL,**

      **Plaintiff,**

  v.                                   **Civil Action 2:15-cv-2983**
                                          **Chief Judge Edmund A. Sargus, Jr.**
                                          **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff Frederick Ravnell filed this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for supplemental security income. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge ("ALJ") under Sentence Four of § 405(g).

**I. BACKGROUND**

**A.**     **Prior Proceedings**

Plaintiff applied for benefits on April 17, 2012, alleging a disability onset date of September 1, 1985. (Doc. 9 at Tr. 136, PAGEID #: 566). His application was denied initially on July 27, 2012 (*id.* at Tr. 86, PAGEID #: 516), and upon reconsideration on March 13, 2013 (*id.* at Tr. 94, PAGEID #: 524). Administrative Law Judge Thomas L. Wang (the "ALJ") held a hearing on May 9, 2014 (*id.* at Tr. 31, PAGEID #: 461), after which he denied benefits in a written decision on June 6, 2014 (*id.* at Tr. 14–24, PAGEID #: 444–54). That decision became

final when the Appeals Council denied review on September 23, 2015.  (*Id.* at Tr. 1, PAGEID #: 431).  Plaintiff now appeals.  (Doc. 9 (administrative record); Doc. 11 (statement of errors); Doc. 16 (response); Doc. 17 (reply)).

        B.        **The Testimony at the Administrative Hearing**

At the time of his hearing, Plaintiff was 33 years old with a ninth-grade education.  (Doc. 9 at Tr. 34, PAGEID #: 464).  The ALJ first asked Plaintiff to explain his disability, to which Plaintiff responded:

> My problem with -- because I got, like, like I had, like, problems like with my brain.  Like, I be like my level, my reading and my education, is not really there.  I mean, really, like my mind is not really like -- I mean, my education has always been on the slow level, you know, my -- how I act and all that, and then I blink out sometimes.  You know, all that type of stuff, like, I don't but it -- it's a lot.  I mean, I don't -- I mean, just like I have like problems with my brain, you know.

(*Id.* at Tr. 33, PAGEID #: 463).  After Plaintiff told the ALJ he has had this problem his whole life, he tried again to explain his issues:

> When I was young I got in, like, when I was young -- I don't know how my ma explained but it's like I just -- well, I had a brain or something -- I've got something wrong with my brain, like, when I feel when I was a kid.  You know, I had that problem all my life.  Like it just like my thinking is really, really bad, it's like I just -- it's kind or hard for me to explain, you know.  It's hard, it's real hard, you know.

(*Id.* at Tr. 33–34, PAGEID #: 463–64).  When the ALJ asked Plaintiff if he had been diagnosed with any official mental impairments, Plaintiff did not understand the question.  (*Id.* at Tr. 35, PAGEID #: 465).

The ALJ moved on to Plaintiff's work background.  Plaintiff testified that he had a limited work history and that he was unemployed at the time of the hearing.  When asked why,

Plaintiff said he "can't fill out applications" because he "do[esn't] know how to" and he struggles "spelling-wise." (*Id.*). He explained further that he cannot hold a job because he cannot understand simple instructions. (*Id.* at Tr. 38–39, PAGEID #: 468–69; *see id.* at Tr. 38, PAGEID #: 468 ("I can't work because it's like when I work I can't really -- like when I work I can't -- it's like I can't comprehend."); *id.* at Tr. 42, PAGEID #: 472 (Plaintiff on why his job at Taco Bell did not last: "They kept explaining to me, I couldn't get what they was telling me to do.")). When asked whether his past jobs were part-time or full-time, Plaintiff had trouble answering: "I don't know the -- . . . part and full time, I don't know what -- that basically what you saying. Like, you saying . . . par-time, full-time, I don't understand that." (*Id.* at Tr. 40, PAGEID #: 470).

Plaintiff testified also about his daily activities and social life. At the time of the hearing, he lived with his mother and brother. (*Id.* at Tr. 37–38, PAGEID #: 464–65). He did not drive and was not capable of doing so. (*Id.* at Tr. 34, PAGEID #: 464 (". . . I had blackouts. I drove and swerved off the road and all that . . . .")). His mother took him where he needed to go. (*Id.* at Tr. 43, PAGEID #: 473). Although he used the bus on occasion, Plaintiff had to rely on the bus driver to let him know where to get off because he could not read the bus schedule. (*Id.* at Tr. 43–44, PAGEID #: 473–74). Plaintiff testified that he has no friends (*id.* at Tr. 38, PAGEID #: 468), saying that he spends all day watching television, almost exclusively the "animal channel" (*id.* at Tr. 42, PAGEID #: 472), and drawing pictures of animals he sees on television (*id.* (" . . . I like drawing. So, I take pictures of a tiger, look at a tiger and I'm drawing it because -- that's basically what I do.")).

3

Plaintiff testified that he did not do any vacuuming, dishes, or cooking—he tried to cook "Ramen noodles" and "boiled eggs" in the past, but no longer does: "I mean, I burnt the whole -- I can't really cook." (*Id.* at Tr. 45, PAGEID #: 475). Now, he says, "my mom cooks for me." (*Id.*). He admitted to being able to "push start" on a microwave, after which his attorney asked him if he could "look at a package and figure out how long the things need to be in the microwave." (*Id.* at Tr. 46, PAGEID #: 476). Plaintiff responded: "I don't heat the microwave. I mean, do, like, boil water, I don't know." (*Id.* (Plaintiff's attorney: "Okay. All right. Very good. Okay.")).

Plaintiff testified next about his physical and mental issues. He said his knees bother him, occasionally to the point where he cannot stand. (*Id.* at Tr. 49, PAGEID #: 479; *see id.* at Tr. 48, PAGEID #: 478 ("[My knees] still crack[] when I walk and then sometimes I can't get up in the morning. I just like feel real weak in my legs.")). Emotionally, Plaintiff said that he sometimes has "blackouts" and "hit[s] stuff" when he gets mad (*id.*), which happens about once a week (*id.* at Tr. 50, PAGEID #: 480).

Plaintiff's mother testified next. She confirmed that he does very little work around the house, testifying that "he know how to make up his bed, and, you know, try to keep his room kind of clean, but the rest of it I don't let him do." (*Id.* at Tr. 52, PAGEID #: 482). When asked why, Plaintiff's mother said that she has to explain things to him "four or five, six, seven, eight times," after which he still cannot follow directions. (*Id.*). She gave examples of Plaintiff using an entire bottle of dish soap to wash the dishes, and breaking her washer when he "put too much of the soap powder in it." (*Id.* at Tr. 53, PAGEID #: 483). She testified that she does not let him cook out of worry that "he might catch the whole house on fire." (*Id.*). And she stated that

Plaintiff has trouble holding a job because of his inability to understand directions.  (*See id.* at Tr. 53–54, PAGEID #: 483–84).  When asked whether she thought her son could work any kind of job, his mother said he could not: "My opinion, if you can't work a fast food, you can't work a warehouse, you can't  -- where can he work[?]"  (*Id.* at Tr. 58, PAGEID #: 488).  Finally, the ALJ asked Plaintiff's mother whether he had been diagnosed with an official mental impairment.  She answered:

> I think he was six month, when we live in Youngstown, he fell out of a highchair when he was six month and he split his head.  And they kept telling me, they said -- I was young.  They was like, "Ma'am, you have to bring him back because we going to have to run tests on his brains."  But I was young and I never took him back, so I fault myself because when he fell I didn't take him back to the doctor because they said when he get older he is going to have a problem.  And right now today they is so much right, he has a problem in his [head] and I should have got it checked, but I was young.

(*Id.* at Tr. 59, PAGEID #: 489).

### C. The Record

Plaintiff's school records show that he was first placed in special education at the age of seven with a disability diagnosis of "Developmentally Handicapped."  (Doc. 9 at Tr. 285, PAGEID #: 715).  In subsequent records, school officials and teachers rated Plaintiff consistently as "significantly below average intellectual[ly]" based on aptitude-test scores and academic performance.  (*Id.* at Tr. 293, PAGEID #: 723; *see id.* at Tr. 295, PAGEID #: 725).  For example, when Plaintiff was sixteen, his special-education summary stated that he "is able to recognize words at the 2nd gr. Level" and that he "comprehends rdg. at the upper second gr. level."  (*Id.* at Tr. 218, PAGEID #: 648).

Plaintiff saw three consultative examiners during the administrative process.  On July 11,

2012, state consultative examiner Lari Meyer, Ph.D., conducted a psychological evaluation. Plaintiff told Dr. L. Meyer the reason for the consultation was that Plaintiff had "a disability problem" because he did not know how to spell or read, did not "understand big words," and "punch[ed] walls" when he got angry. (*Id.* at Tr. 248, PAGEID #: 678). Dr. L. Meyer remarked that Plaintiff did "not recall the answers to most questions asked," many of which were basic in nature, and that he "act[ed] confused." (*Id.* at Tr. 252, PAGEID #: 682 (noting Plaintiff "confuse[d] yes/no head nodding/shaking")). Dr. L. Meyer found all of this "highly suspect." (*Id.*). Moreover, Plaintiff scored a 44 on the IQ test Dr. L. Meyer administered, a result Dr. L. Meyer found "grossly invalid." (*Id.*). Plaintiff's performance during the evaluation prompted Dr. L. Meyer to administer the "Key 15-Item Memory Test" to determine whether Plaintiff took the examination seriously. (*See id.* at Tr. 256, PAGEID #: 686). Dr. L. Meyer found Plaintiff's score on the memory test "suggestive of at least some exaggeration of impairment." (*Id.*). Based on the above, Dr. L. Meyer concluded that she did not have enough information to make a diagnosis of any kind (*id.* at Tr. 256–58, PAGEID #: 686–88), and instead opined that "a diagnosis of malingering should be considered" (*id.* at Tr. 256, PAGEID #: 686).

A psychologist from the same office, Steven J. Meyer, Ph.D., examined Plaintiff on February 11, 2013. (*Id.* at Tr. 261, PAGEID #: 691). He described Plaintiff as "slow and awkward" with "apparent impairments in his fine and gross motor abilities." (*Id.* at Tr. 263, PAGEID #: 693). He remarked further that Plaintiff seemed to "experience[] symptoms consistent with depression" and that Plaintiff "report[ed] feeling depressed" and "angry." (*Id.*). Moreover, he observed "some evidence of" problems with "concentration, persistence, [and] pace." (*Id.* at Tr. 265, PAGEID #: 695; *see id.* at Tr. 264, PAGEID #: 694). Dr. S. Meyer

6

remarked that "there was a question of malingering consistent with the 7/12 psychological evaluation" written by Dr. L. Meyer.  (*Id.* at Tr. 265, PAGEID #: 695).  Based upon these observations and the examination, Dr. S. Meyer concluded "there is no information that would preclude [Plaintiff] from working in a low stress work setting." (*Id.*).

On August 7, 2013, Plaintiff saw Keli A. Yee, Psy.D., for his next consultative examination.  (*Id.* at Tr. 419, PAGEID #: 849).  The examination led Dr. Yee to conclude that Plaintiff had "anger problems" based on Plaintiff's description of his problem-solving abilities. (*Id.* at Tr. 421, PAGEID #: 851).  Additionally, Plaintiff told Dr. Yee he "fe[lt] sad most of the time."  (*Id.* (Plaintiff reporting that he tried to commit suicide "once but it was a long time [ago]")).  Plaintiff was unable to answer basic questions.  (*Id.* at Tr. 424, PAGEID #: 854 (failing to compute "12-4" and "42/6")).  Dr. Yee found Plaintiff to be "very distracted" (*id.* at Tr. 421, PAGEID #: 851), with a depressed mood and a "[f]acial expression [that] appear[ed] confused." (*Id.* at Tr. 423–24, PAGEID #: 853–54; *id.* at Tr. 423, PAGEID #: 853 (noting that Plaintiff had a "below average" vocabulary)).  Based on her examination, Dr. Yee diagnosed Plaintiff with "Learning Disorder, NOS" and "Mood Disorder, NOS" (*id.* at Tr. 424, PAGEID #: 854), and concluded that he was "unemployable" (*id.* at Tr. 418, PAGEID #: 848).

In addition, the record includes a written report issued by Daniel Hrinko, Psy.D., on April 15, 2014.  (*Id.* at Tr. 267, PAGEID #: 697).  Dr. Hrinko examined Plaintiff pursuant to a court order by Judge Stephen McIntosh of the Franklin County Court of Common Pleas to assess Plaintiff's ability to stand trial in an unrelated criminal matter.  (*Id.* at Tr. 267–68, PAGEID #: 697–98).  Dr. Hrinko observed that Plaintiff "had difficulty with abstract concepts," which gave "the impression that he [] suffered from mental retardation."  (*Id.* at Tr. 273, PAGEID #: 703

7

(Dr. Hrinko remarking that Plaintiff "was easily distracted," "seemed confused about place and purpose," and had "difficulty remembering even simple information")). Dr. Hrinko observed further that Plaintiff did not understand his own role, his attorney's role, or the judge's role in the criminal process. (*Id.* at Tr. 279, PAGEID #: 709). As one explanation for Plaintiff's performance, Dr. Hrinko "noted that previous evaluations" indicate "that he was malingering or feigning low functioning for the purpose of obtaining disability benefits." (*Id.* at Tr. 273–74, PAGEID #: 703–04). Based on Dr. Hrinko's own observations, however, he concluded the following: "It is my opinion, with reasonable psychological certainty, that the defendant is not currently capable of understanding the nature and objective of the proceedings against him and of assisting in his own defense." (*Id.* at Tr. 281, PAGEID #: 711; *see id.* at Tr. 278, PAGEID #: 708 ("He was unable to provide a definition of 'innocent' or of 'guilty' . . . ."); *id.* at Tr. 274, PAGEID #: 704 (noting a similar opinion by a different examiner in a prior criminal matter, who concluded that Plaintiff "was not capable of understanding the nature and objective of the proceedings against him or assisting in his own defense")).

      **D.**      **The ALJ's Decision**

The ALJ determined that Plaintiff's intellectual disability qualified as a severe impairment. (Doc. 9 at Tr. 16, PAGEID #: 446). At step three, he determined Plaintiff did not meet any of the listed impairments. (*Id.* at Tr. 17, PAGEID #: 447). In particular, the ALJ found Plaintiff's claim to Listing 12.05C "unpersuasive . . . because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function." (*Id.* (emphasis in original) (finding that Plaintiff's knee pain did not qualify as severe)).

At step four, the ALJ examined Plaintiff's residual functional capacity ("RFC").  He acknowledged that Plaintiff had "been diagnosed with an intellectual disability, characterized by the school psychologist as borderline intellectual functioning and as mental retardation by court-ordered consultative examiner Daniel Hrinko."  (*Id.*).  Despite this, the ALJ found Plaintiff's testimony "not entirely credible."  (*Id.* at Tr. 20, PAGEID #: 450).  He gave great weight to the consultative examiner reports from Dr. L. Meyer and Dr. S. Meyer.  By contrast, he gave "[v]ery little weight" to Dr. Yee's assessment, reasoning that "she is not a treating source" and her conclusion was both "contradicted by other credible opinions" and "wholly inconsistent with the totality of the evidence."  (*Id.* at Tr. 23, PAGEID #: 453).  Based upon the above, the ALJ concluded that the evidence demonstrated that Plaintiff exaggerated "his mental difficulties for the purpose of obtaining disability."  (*Id.* at Tr. 20, PAGEID #: 450).

Relying on these and other considerations, the ALJ ultimately concluded that Plaintiff had the capacity to perform a full range of work at all exertional levels, albeit with significant nonexertional limitations to account for Plaintiff's intellectual limitations and frustration issues.  (*See id.*).  Based upon the foregoing and his finding that jobs exist in significant numbers in the national economy that Plaintiff could perform, the ALJ denied benefits. (*See id.* at Tr. 23–24, PAGEID #: 453–54).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III. DISCUSSION

Plaintiff assigns one error, arguing the ALJ erred at step three. A claimant will be found disabled at step three if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "Listing 12.05 describes circumstances in which [intellectual disability] is severe enough to preclude gainful activity." *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). Plaintiff contends he meets Listing 12.05C. A claimant must satisfy three requirements to meet 12.05C: (1) significant subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period (i.e., before the age of twenty-two); (2) a verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation on function. *Id.*

Plaintiff attacks the ALJ's finding on each of these requirements. First, Plaintiff contends the ALJ erred in finding that Plaintiff's intellectual disability did not manifest before the age of 22, and second, that the ALJ improperly discounted a valid verbal IQ score of 65. (*See* Doc. 11

at 6–7). The Commissioner now concedes that Plaintiff meets the first two prongs of Listing 12.05C. (Doc. 16 at 6; *see* Doc. 9 at Tr. 293, PAGEID #: 723 (Plaintiff assessed as "significantly below average intellectual[ly]" at age eleven); *id.* at Tr. 218, PAGEID #: 648 (reading comprehension at second-grade level when Plaintiff was sixteen years old); *id.* at Tr. 293, PAGEID #: 733 (verbal IQ score of 65 at age eleven)). This leaves the third requirement.

### A. Plaintiff's Mood Disorder

The third requirement of Listing 12.05C requires a claimant to have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Dragon v. Commr. of Social Sec.*, 470 Fed.Appx. 454 (6th Cir. 2012). Plaintiff contends that the ALJ erred by not even considering whether Dr. Yee's diagnosis of a mood disorder qualified as a mental impairment at step three.

The ALJ must consider both physical and mental impairments when analyzing whether a claimant meets this requirement. *See Crabtree v. Astrue,* No. 3:10CV00458, 2012 WL 260460, at *11 (S.D. Ohio Jan. 20, 2012) *report and recommendation adopted,* No. 3:10CV00458, 2012 WL 529817 (S.D. Ohio Feb. 17, 2012). In *Crabtree*, when analyzing the requirements of Listing 12.05(C), the ALJ stated that "the claimant's anxiety and depression [did] not result in significant work-related functional limitations," and therefore "found that the requirements of paragraph C [were] not met." (*Crabtree*, 10-cv-458, Doc. 8 at Tr. 17, PAGEID #: 50). Upon review, this Court held that the ALJ erred by considering only the claimant's mental impairment and "failing to consider whether Plaintiff had a physical impairment imposing an additional and significant work-related limitation of function." *Crabtree,* 2012 WL 260460, at *11 ; *see also Pennington v. Commr. Of Social Sec.*, No. 1:13-cv-00591, 2014 WL 4774095 (S.D. Ohio Sept.

11

24, 2014) ("[T]he ALJ's failure to expressly discuss Plaintiff's IQ scores *and* analyze her impairments within a § 12.05(C) framework denotes a lack of substantial evidence for his determination") (emphasis added).

Here, the ALJ considered only Plaintiff's knee pain in concluding that Plaintiff did not have an impairment that imposed a work-related limitation on function. (Doc. 9 at Tr. 17–18, PAGEID #: 447–48) ("[A]s discussed previously in this decision, the undersigned does not find that the claimant has a severe *physical* impairment.") (emphasis added).  But knee pain was not the only impairment at issue. (*See id.* at Tr. 206, PAGEID #: 636 (Plaintiff's representative brief, submitted to the ALJ prior to the administrative hearing, stating that Plaintiff has "additional psychological" issues "over and above the intellectual disability")). In particular, Dr. Yee diagnosed Plaintiff with a mood disorder based upon his symptoms consistent with depression. (*Id.* at Tr. 421–24, PAGEID #: 851–54; *see id.* at Tr. 263, PAGEID #: 693; (Dr. S. Meyer noting that Plaintiff "experiences symptoms consistent with depression including a depressed mood with an onset years ago")). Depression and mood disorders can be significant and severe enough within the meaning of the Social Security Act to constitute work-related functional limitations. *See Crabtree*, 2012 WL 260460, at *11 ("[T]he ALJ concluded herself, and this Court agrees, that Plaintiff's anxiety and depression are "severe" within the meaning of the Social Security Act").

Moreover, an ALJ's decision must contain sufficient analysis to allow meaningful review of whether a claimant meets one of the Listings. *See Clifton v. Colvin*, No. 1:13CV1895, 2014 WL 2946655, at *5 (N.D. Ohio July 1, 2014) ("In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision."); *Warren v. Comm'r of Soc. Sec.*,

2011 WL 1085884 at * 2 (N.D. Ohio March 22, 2011) ("[I]n cases where there is evidence in the record of one criteria for establishing disability, the lack of articulated reasons by the ALJ as to why there is no disability under the listing denotes a lack of substantial evidence in support of the decision, even where the conclusion may otherwise be justified by later recourse to the entire record."). The ALJ did not mention (let alone discuss) any potential mental impairment in step three when concluding that Plaintiff did not meet or equal the criteria of Listing 12.05C. Accordingly, the Court finds that the ALJ erred at step three.

The Commissioner responds that the ALJ's failure to discuss explicitly Dr. Yee's mood disorder diagnosis at step three does not matter because the ALJ's decision to give Dr. Yee's entire report little weight—which the ALJ did at step four—is supported by substantial evidence. She additionally argues that the ALJ must have implicitly considered Dr. Yee's mood disorder diagnosis at step three and rejected it. (*See* Doc. 16 at 6–7).

The Commissioner's argument falls short. First, the ALJ's explanation as to why he gave Dr. Yee's opinion "little weight" addresses only the portion of Dr. Yee's opinion regarding marked impairments of functioning but at no point analyzes (or even mentions) Dr. Yee's mood disorder diagnosis. (Doc. 9 at Tr. 23, PAGEID #: 453). Because an ALJ may give little weight to one part of an opinion and greater weight to another, the Court is reluctant to assume that the ALJ considered and rejected Dr. Yee's mood disorder diagnosis. Moreover, Dr. Yee's opinion does not stand alone. Dr. S. Meyer, whose opinion the ALJ assigned great weight, opined that Plaintiff had depression. (Doc. 9 at Tr. 263, PAGEID #: 693). This evidence relates to whether Plaintiff meets Listing 12.05C, and the ALJ did not address Dr. S. Meyer's opinion at step three. As such, the Court concludes that the ALJ's decision denying benefits is not supported by

13

substantial evidence.

### B. Remand

Plaintiff asks the Court to enter judgment in his favor or, in the alternative, for a remand. "Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding." *Wilkerson*, 2010 WL 817307, at *14. Because the ALJ failed to consider or discuss whether claimant possessed any mental impairment imposing an additional and significant work-related limitation on function, the undersigned recommends that this matter be remanded to consider evidence of Plaintiff's mood disorder and whether it satisfies the third requirement under Listing 12.05C.

Finally, Plaintiff contends that the respective consultative examiner reports from Dr. L. Meyer and S. Meyer are flawed because they did not have access to Plaintiff's IQ information. (Doc. 11 at 11). The Commissioner does not respond to this point. On remand, "[t]he Commissioner or the Plaintiff may . . . order whatever tests" or examinations "they feel are appropriate to facilitate swift disposition of this matter." *Hall v. Astrue*, No. 3:11-CV-571, 2012 WL 6924162, at *7 (E.D. Tenn. Dec. 11, 2012), *report and recommendation adopted*, No. 3:11-CV-571, 2013 WL 264321 (E.D. Tenn. Jan. 23, 2013). To the extent that any additional consultative examinations are ordered regarding the Plaintiff's impairments, whether conducted by Dr. L. Meyer, Dr. S. Meyer, or by another examiner, the undersigned recommends that the Court direct the ALJ to require that those examiners have access to Plaintiff's full academic record and prior IQ-testing information for the purpose of their evaluations and reports. (*See* Doc. 11 at 11); *Horn v. Comm'r of Soc. Sec.*, No. 1:13CV610, 2014 WL 5107598, at *5 (S.D.

Ohio Oct. 10, 2014) ("[T]the ALJ similarly failed to offer any indication that he had considered the timing of the non-examining consultants' opinions, and the fact that they were rendered on an incomplete record."); *Hambrick v. Comm'r of Soc. Sec.*, No. 1:13-CV-374, 2014 WL 1961945, at *6 (S.D. Ohio May 15, 2014) ("[A]n ALJ may credit the opinion of even a non-examining consultant who has failed to review a complete record, so long as he or she acknowledges that fact and articulates valid reasons for doing so."), *report and recommendation adopted*, No. 1:13CV374, 2014 WL 2589317 (S.D. Ohio June 10, 2014); *Baker v. Colvin*, No. 2:12-CV-00264, 2013 WL 1324309, at *7 (S.D. Ohio Mar. 28, 2013), *report and recommendation adopted*, No. 2:12-CV-264, 2013 WL 3965292 (S.D. Ohio July 31, 2013).

## IV.   CONCLUSION

For the reasons stated, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge ("ALJ") under Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation.

## Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

15

evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

    IT IS SO ORDERED.

Date:  November 17, 2016                                   /s/ Kimberly A. Jolson
                                                              KIMBERLY A. JOLSON
                                                              UNITED STATES MAGISTRATE JUDGE